J. A14001/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MIGUEL FIGUEROA-NOVOA, | : | No. 1494 MDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, May 1, 2013,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0000931-2011

BEFORE: FORD ELLIOTT, P.J.E., OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED AUGUST 13, 2014**

Following a jury trial, Miguel Figueroa-Novoa was convicted of first degree murder, attempted murder, and carrying a firearm without a license. Following review, we find appellant's issues meritless and affirm.

On December 22, 2010, at approximately 6:00 a.m., appellant went to the apartment where his estranged girlfriend, Nicole Berrios, lived with their son and her mother. Appellant shot and killed Berrios and also shot and injured her mother. Prior to walking out of the apartment, appellant turned the gun on himself, shooting himself in the mouth. Appellant drove himself roughly two miles to the emergency room at Harrisburg Hospital. Appellant claimed he was intoxicated and accidently shot and killed Berrios.

Following his arrest, appellant filed a motion to suppress, which was denied. A jury trial was held from April 22, 2013 through April 30, 2013.

_____

* Retired Senior Judge assigned to the Superior Court.

Thereafter, he was found guilty of the aforementioned crimes. On May 1, 2013, he was sentenced to life imprisonment, a consecutive term of 20 to 40 years' incarceration for attempted murder, and a concurrent term of 3½ to 7 years' incarceration for VUFA. Appellant filed a post-sentence motion, which was denied on July 17, 2013. Notice of appeal was timely filed August 16, 2013. Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal within 21 days pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

The following issues have been presented for our review:

I.    Whether the trial court erred in failing to suppress Appellant's statements where police failed to sufficiently administer *Miranda* warnings prior to custodial interrogation and where Appellant was unable to knowingly, voluntarily, and intelligently waive those rights due to his injuries and the narcotics he was administered in violation of Article 1, Section 9 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution?

II.   Whether the trial court erred in precluding the jury from considering the statement contained in Deputy Coroner Zachary Smeltz's report for its substantive value that Appellant "arrived home intoxicated and started waving a gun around" where such evidence was admissible for its substantive value?

III.  Whether the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions for first-degree murder and attempted murder where the Commonwealth failed to prove that Appellant possessed

> specific intent and where Appellant was intoxicated to such an extent so as to overwhelm his faculties and sensibilities?

Appellant's brief at 6 (underlining omitted).[1]

We have carefully reviewed the briefs, the relevant law, the record, and the well-reasoned opinion authored by the Honorable Todd A. Hoover. We find that Judge Hoover's opinion correctly disposes of the issues presented, and accordingly, we affirm based on the trial court's opinion.

However, we note that the trial court did not dispose of a sub-issue included in appellant's first issue. Specifically, the court did not address appellant's argument, concerning whether he should have been **_Mirandized_** when Detective Taylor asked him what they should do with his vehicle. Thus, we write separately to address a portion of appellant's first issue.

The facts related to appellant's motion to suppress were aptly summarized by the trial court. We include only the following portion which is directly related to the issue at hand.

> Officer Jennie Jenkins testified that on December 27, 2010, she was assigned to watch over [appellant], who was hospitalized in the Hershey Medical Center. Officer Jenkins was in full uniform. [Appellant] was in police custody. Another officer, Detective Taylor, the lead detective in the case, arrived in the room, introduced himself to [appellant], and gave [appellant] a writing board with which to communicate. When Officer Jenkins made a comment to [appellant] in Spanish, he "kind

---

[1] An additional issue concerning the weight of the evidence presented in appellant's Rule 1925(b) statement has not been presented to our court in his brief; hence, we deem it to have been abandoned.

of lit up" such that the officers realized that [appellant] preferred to communicate in Spanish. Detective Taylor had a limited conversation with [appellant] regarding what [appellant] wanted done with his vehicle. Neither Detective Taylor nor Officer Jenkins questioned [appellant] about the incident. Detective Taylor left after obtaining the information or approval regarding [appellant]'s vehicle.

After Detective Taylor left, hospital staff removed the tracheotomy tube from [appellant]'s throat. Hospital staff asked [appellant] if he could speak, and requested that he count, which he did.

Trial court opinion, 11/13/13 at 2-9 (citations to the record omitted).

The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person being interrogated. *Commonwealth v. Gwynn*, 723 A.2d 143, 148 (Pa. 1998). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Commonwealth v. Johnson*, 541 A.2d 332, 336 (Pa.Super. 1988), quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Id.*, quoting *Commonwealth v. Simala*, 252 A.2d 575, 578 (Pa. 1969). When a person's inculpatory statement is

not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings. ***Id.***

There is no question that appellant was in custody at the time the detective came to his hospital room as appellant was handcuffed to the bed. Thus, the only question before us is whether the encounter rose to the level of an interrogation or the "functional equivalent" of an interrogation, such that the ***Miranda*** safeguards were implicated.

Detective Taylor and Officer Jenkins came into his hospital room. Detective Taylor asked appellant a question about the vehicle he left unattended in front of the hospital and inquired what appellant wanted done with the vehicle. (Notes of testimony, 3/29/13 at 11.) Appellant instructed the detective to give it to a family member. (***Id.***) This was the entirety of the conversation; neither the detective nor the officer questioned appellant about the incident. (***Id.***)

We agree with the Commonwealth that appellant fails to assert an incriminating statement that was elicited from this conversation. We also agree that the detective did not ask this question with the intent to extract incriminating statements. Therefore, ***Miranda*** warnings were not required. ***See Commonwealth v. Jasper***, 587 A.2d 705, 708-709 (Pa. 1991) (defendant's answer that he owned a particular vehicle, which was later used at trial to place the defendant at the murder scene, was admissible because "the information received was nothing more than general information in

response to a form").   Accordingly, we find that the trial court properly denied appellant's motion to suppress.[2]

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2014

---

[2] Additionally, the fact that appellant used the white Acura that night would have inevitably been determined as appellant's blood was splattered throughout the interior of the car.

REC'D NOV 1 3 2013

COMMONWEALTH

v.

MIGUEL FIGUERO-NOVA

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
: NO. 931 CR 2011
: CHARGE(S): MURDER, ET AL
:

## TRIAL COURT OPINION

This appeal follows the jury's finding of Miguel Figuero-Nova ("Defendant") guilty of Murder of the First Degree, Criminal Attempt (Homicide) and Carrying Firearms without a License.

The Commonwealth filed a Notice of Aggravating Circumstances on April 25, 2011. Defendant filed a Motion to Quash Commonwealth's Notice of Aggravating Circumstances on July 31, 2012, to which the Commonwealth filed a Response on August 28, 2013.

Defendant filed an Omnibus Pre-trial Motion on March 21, 2013 which raised the following: 1) Motion for Separate Guilt Phase and Penalty Phase Jurors; 2) Motion for Extended *Voir Dire* Proceedings; 3) Motion to Instruct the Jury as to the Definition of Life Imprisonment at All Levels of the Pending Proceedings; 4) Motion to Preclude the Commonwealth from Seeking the Death Penalty as Depriving the Defendant of an Impartial Jury; 5) Challenge to Pennsylvania Jury Instructions; 6) Motion to Declare 42 P.A.C.S. §9711 *et seq.* Unconstitutional and to Bar Imposition of the Death Penalty; 7) Motion to Preclude the Commonwealth from Seeking the Death Penalty as Cruel and Unusual Punishment; 8) Motion to Preclude the Commonwealth

1

from Seeking the Death Penalty as Depriving the Defendant of a Fair Trial; 9) Suppression of Statements.

Defendant was tried before a jury April 22, 2013 through April 30, 2013. Following the verdicts of guilty, the case proceeded to the sentencing phase. On the conviction of Murder in the First Degree the jury returned the verdict of life imprisonment without the possibility of parole. The court sentenced Defendant as follows:

Count 1, Murder of the First Degree. Life Imprisonment

Count 2, Criminal Attempt (Homicide), not less than twenty (20) nor more than forty (40) years consecutive to Count 1; and

Count 3, Carrying Firearms without a License, not less than three and a half (3 1/2 ) nor more than seven (7) years to be served concurrently with the sentences imposed at Counts 1 and 2.

Defendant filed A Post Sentence Motion on May 8, 2013, to which the Commonwealth filed an Answer on May 28, 2013. The court denied Defendant's Post Sentence Motion by Order of July 17, 2013.

Defendant filed a Notice of Appeal on August 16, 2013, and a timely Concise Statement of Errors Complained of on Appeal Pursuant to Appellate Rule of Procedure 1925(b) on September 9, 2013.

## GENERAL FACTUAL BACKGROUND

Twelve year old Lithz ("Nane") Bercedia, testified that on the evening of December 22, 2010, visiting the victim, Nicole Berrios, Nicole's mother, Lithz Serrano, and Nicole and Defendant's 2 year old son, Journey, at their Ivey Lane apartment in Harrisburg. (N.T. p.225) Nane fell asleep with the toddler on a sofa, but was awakened by a door slamming. (N.T. p. 227) Nane

2

then observed Defendant walk toward Nicole, who was sleeping, and begin talking to her. (N.T. p. 230) Nane heard Defendant tell Nicole he loved her, and did not want to lose her. (N.T. p. 231)

The conversation woke Ms. Serrano, who went into the bathroom. (N.T. p. 231) While Ms. Serrano was in the bathroom, Nane observed Defendant enter the kitchen and retrieve a gun from the top of a cabinet. She heard the sound of bullets being placed in the clip of a gun. (N.T. p. 232) Defendant left the apartment and began shooting. Id. He re-entered the apartment, shot Nicole and waited for Lithz Serrano to exit the bathroom. Defendant shot Ms. Serrano twice. (N.T. p. 234) Nane ran out of the apartment with Journey to the building's laundry room, where she hid him in a washing machine, then ran to seek help. (N.T. p. 235)

Ms. Serrano testified that she learned in November 2010 that Nicole and Defendant had separated, and that Nicole did not want to reconcile. (N.T. pp. 250-252) Ms. Serrano arrived at the Ivey Lane apartment at about 7:30 p.m. on December 22, 2010. (N.T. pp. 253) She fell asleep on the sofa, and was awakened by Defendant speaking to Nicole, as he crouched next to her. (N.T. pp. 257-258) Defendant then spoke to Ms. Serrano, and pleaded with her to convince Nicole to reconcile. Id. Ms. Serrano told Defendant to "give [Nicole] time". Ms. Serrano then went into the bathroom to prepare to go to work. (N.T. pp. 259)

When Ms. Serrano exited the bathroom, Defendant stood in front of her, pointed a gun at her, and shot her twice. Ms. Serrano shouted to Nane to take Journey and run. Defendant then shot Ms. Serrano a third time. (N.T. pp. 260) Ms. Serrano called out for Nicole, and learned that Defendant shot Nicole also. Ms. Serrano lay on the floor with Nicole until Nicole passed away. (N.T. p. 262)

3

Defendant left the apartment, then returned, stated, "Oh you're alive", and shot Ms. Serrano twice in her back. (N.T. pp. 256) During the shooting, Defendant stated that it was going to be a "fiesta of blood." (N.T. p. 263) Ms. Serrano feigned death. (N.T. pp. 262)

When Defendant left the room, Ms. Serrano heard a shot. Defendant changed his clothes, spit on the door, went to his car, and drove away. (N.T. p 262)[1] Ms. Serrano screamed for help, and people began responding to her cries. *Id.* When Ms. Serrano overhead police talking on walkie-talkies regarding an Hispanic male at Harrisburg Hospital with a gunshot wound, she told them that Miguel Figueroa shot her and her daughter.(N.T. p. 263)

At approximately 6:02 a.m., Officer Kirk Aldrich received a dispatch of shots fired and people shot at the Ivey Lane apartments. (N.T. p. 70) Upon his arrival, emergency personnel had already arrived on the scene and entering the building. (N.T. p. 75) Officer Aldrich and another responding officer, Officer McKenzie, entered the building and observed blood on the stairs leading up to the third floor, and into Apartment 9. (N.T. pp. 76-77) Officers encountered a graphic scene: a young Hispanic female, obviously deceased with multiple gunshot wounds to the chest, and another female, alive, attended to by emergency personnel. (N.T. p. 77)

Not knowing the location of the shooter, and concerned for the safety of the victim and responders, Officer Aldrich instructed EMS personnel to move the victim to whom they were attending. (N.T. p. 78) Officer Aldrich requested assistance from the SWAT team. (N.T. pp. 80-81) When other officers arrived, while outside the apartment, Officer Aldrich learned that a child who had been in the apartment had been placed in a patrol car. (N.T. p. 82) Officer Aldrich spoke to a young girl who stated that "Miguel" shot the people, and that he left. *Id.* Officer

---

[1] Defendant shot himself in the jaw.

4

Aldrich returned to the apartment, where he observed spent shell casings and a live bullet on the floor. (N.T. p. 85)

On December 23, 2010, Officer Angel Gonzales received a dispatch to Harrisburg Hospital. (N.T. p. 123) Upon his arrival there, Officer Gonzales observed a white Accura, with the door open, at the patient drop-off area. (N.T. p. 125) Officer Gonzales walked around the vehicle and observed blood throughout the vehicle, as well as a handgun, clip and ammunition. *Id.* Officer Gonzales learned that the vehicle was related to an incident to which police had responded. A search of information revealed that the vehicle belonged to Defendant. *Id.* Police retrieved the gun, and after obtaining a search warrant, collected paperwork, a wallet, a cell phone and spent casings from the vehicle. (N.T. p. 178)

Dr. Wayne Ross, a forensic pathologist, testified regarding the autopsy performed on Nicole Berrios, age 19. ((N.T. p. 95) Examination of the victim's clothing revealed that she had been shot from a distance of 3-4 feet or more. (N.T. pp. 97-98) Dr. Ross opined, based upon X-rays and examination, that a bullet entered the victim's torso just above the rib cage in a downward trajectory toward her left lower back. Based upon those findings, Dr. Ross opined that the shooter pointed the gun downward toward the victim. (N.T. pp. 99-101) Dr. Ross determined that the victim died of a gunshot wound to the chest, and that the manner of death was homicide. (N.T. p. 101)

## FACTS RELEVANT TO MOTION TO SUPPRESS

Officer Jennie Jenkins testified that on December 27, 2010, she was assigned to watch over Defendant, who was hospitalized in the Hershey Medical Center. (Transcript of Proceedings, Pre-Trial Motions March 29, 2013, p.6)(hereinafter, "N.T. Suppression Hearing") Officer

5

Jenkins was in full uniform. Defendant was in police custody. (N.T. Suppression Hearing, p. 9) Another officer, Detective Taylor, the lead detective in the case, arrived in the room, introduced himself to Defendant, and gave Defendant a writing board with which to communicate. When Officer Jenkins made a comment to Defendant in Spanish, he "kind of lit up" such that the officers realized that Defendant preferred to communicate in Spanish. (N.T. Suppression Hearing, p. 11) Detective Taylor had a limited conversation with Defendant regarding what Defendant wanted done with his vehicle. (N.T. Suppression Hearing, pp. 11-12) Neither Detective Taylor nor Officer Jenkins questioned Defendant about the incident. *Id.* Detective Taylor left after obtaining the information or approval regarding Defendant's vehicle. (N.T. Suppression Hearing, p. 12)

After Detective Taylor left, hospital staff removed the tracheotomy tube from Defendant's throat. (N.T. Suppression Hearing, p. 12) Hospital staff asked Defendant if he could speak, and requested that he count, which he did. *Id.*

After the staff left the room, Defendant began to cry, and told Officer Jenkins that he had been unable to speak during the preceding days, did not know Nicole's condition, and wanted Officer Jenkins to give him information. (N.T. Suppression Hearing, pp. 12-13) Officer Jenkins did not know the status of the investigation, and did not wish to disclose any information. (N.T. Suppression Hearing, p. 14) Defendant appeared very emotional. (N.T. Suppression Hearing, pp. 14) Defendant referred to Nicole as "an angel", stated that he told Nicole "I'm going to kill you, I'm going to kill you", and explained that he obtained a gun. (N.T. Suppression Hearing, pp. 15-16)[1]

---

[1] Defendant raises no issue as to the statements he volunteered to Officer Jenkins, which he offered unilaterally and not in response to any questioning by Officer Jenkins.

Officer Jenkins testified that as Defendant spoke, he did not exhibit that he was in pain or discomfort. (N.T. Suppression Hearing, p. 17) He appeared awake, alert, lucid, and coherent. *Id.* He did not appear to be in pain, but rather, to be relieved to speak about the incident. (N.T. Suppression Hearing, pp. 33-34)

Detective Victor Manuel Rivera testified that on December 27, 2010, he was asked to assist Detective Taylor with interviewing Defendant at the Hershey Medical Center, because Detective Rivera speaks Spanish. (N.T. Suppression Hearing, pp. 41-43) Defendant was in police custody. (N.T. Suppression Hearing, p. 46)

Upon entering the hospital room, Detective Rivera introduced himself to Defendant, and told Defendant he was there to talk to him regarding what had occurred. (N.T. Suppression Hearing, p. 47) Detective Rivera spoke with Defendant about how well Defendant spoke and understood English. *Id.* Detective Rivera testified that Defendant was clear headed, that is, coherent and able to understand everything the detective was saying. (N.T. Suppression Hearing, pp. 49-50) Defendant exhibited no confusion. (N.T. Suppression Hearing, p. 50) He did not appear to be under the influence of any medication. (N.T. p 353) Because the tracheotomy tube had been recently removed from Defendant's throat, Defendant had mucous in in throat, but did not demonstrate that his physical condition prevented him from communicating and understanding. (N.T. p 352)

After the Detective Rivera introduced himself, Defendant asked if Nicole was dead. Detective Rivera told Defendant that she was killed, to which Defendant stated something to the effect, "she was an angel, she shouldn't have died". (N.T. Suppression Hearing, p.51) Detective Rivera told Defendant that his mother in law had been shot, and that she was still alive. *Id.*

7

Within a few minutes of the interaction, before asking Defendant any questions, Detective Rivera administered Defendant his Miranda rights. *Id.* Defendant appeared anxious to speak with the detective about the incident. (N.T. pp. 56-57) The detective administered the rights in both Spanish and English [3] (N.T. Suppression Hearing, p. 52) Defendant stated that he understood his rights, and wanted to talk about the case without an attorney. *Id.* In English and Spanish, Detective Rivera advised Defendant that he had a constitutional right to remain silent, that anything he said could be used against him in a court of law, that before talking, he had the right to an attorney, and that if he could not afford one, one would be provided free of cost. (N.T. Suppression Hearing, p. 53) Detective Rivera apprised Defendant that if he decided he wished to stop talking, he could do so at any time, that Defendant was not obligated to continue talking if he wished to stop. *Id.* At each point in the administration of the rights, in both English and Spanish, Defendant acknowledged that he understood. (N.T. Suppression Hearing, pp. 53-54; (N.T. p 356) At no point did Defendant ask any questions, nor indicate that he was confused or did not understand. (N.T. Suppression Hearing, p. 54) Defendant waived his rights. *Id.*

After administration of Miranda rights, Detective Rivera asked Defendant questions. Defendant was "clear and careful" in answering the questions, that is, he claimed that the shooting was accidental, not intentional. (N.T. Suppression Hearing, p. 56) Defendant corrected Detective Rivera several times on his use of names. Defendant spoke English in some of his answers. (N.T. Suppression Hearing, p. 56; N.T. pp. 357-358) Defendant remained alert and coherent throughout the interview. (N.T. Suppression Hearing, pp. 56-57; (N.T. pp. 356-358)

In the statement, Defendant stated that he saw Nicole run for the door, and that the gun went off. (N.T. p 369) He also stated that he did not want to kill her, and "felt cornered". (N.T. p 371)

---

[3] Defendant raises no issue as to Defendant's understanding of his rights based upon the language in which they were administered.

8

Defendant stated that he shot Ms. Serrano twice because he felt "pressure" and that he shot her because she was going to shoot him. (N.T. p. 374; p. 380)

At the suppression hearing, Defendant testified that he did not understand the rights, and that he was "just talking for the sake of talking". (N.T. Suppression Hearing, p. 70)


DISCUSSION

1.  THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS STATEMENTS WHERE POLICE PROPERLY ADVISED DEFENDANT OF HIS MIRANDA RIGHTS AND DEFENDANT KNOWINGLY AND INTELLIGENTLY WAIVED THOSE RIGHTS.


The trial court properly denied Defendant's motion to dismiss where the record demonstrates that Defendant suffered no cognitive impairment which prevented him from knowingly and intelligently waiving his Miranda rights.

When reviewing the trial court's ruling on a motion to suppress,

[The Appellate Court's] standard of review is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the Appellate Court is] bound by these findings and may reverse only if the suppression court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the facts to the law. Thus, the conclusions of law of the courts below are subject to [the Appellate Court's] plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (2012) citing *Commonwealth v. Hopper*, 39 A.3d 358, 361-62(Pa. Super. 2012)(quoting *Commonwealth v. Jones*, 605 Pa. 188, 198,988 A.2d 649,654-55 (2010)

Also, in undertaking such review, [the appellate court] may consider the evidence presented both at the suppression hearing and at trial." *Commonwealth v. Charleston*, 16 A.3d 505, 516-517 (2011) citing *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311, 317 n.5 (1983) and *Commonwealth v. Carr*, 292 Pa. Super. 137, 436 A.2d 1189, 1191 (1981)

The trial court considered evidence presented at the suppression hearing and at trial in determining that Defendant knowingly and intelligently waived his constitutional rights while in police custody at the Hershey Medical Center on December 27, 2010. Our Superior Court has explained:

> Before an individual may be subjected to custodial interrogation, he or she must make a knowing and intelligent waiver of his or her privilege against self-incrimination and right to counsel after adequate warning as to those rights. The test for determining whether a waiver is knowing and intelligent is multi-faceted. In order to determine the voluntariness, [the appellate court] must ascertain whether the waiver was the result of an intentional choice that was not subjected to undue governmental pressure. To determine whether the waiver was knowing and intelligent, [the appellate court focuses] upon the defendant's cognitive processes, i.e., whether the defendant was aware of the nature of the choice that he made in relinquishing his Miranda rights.

*Commonwealth v. Ellis*, 700 A.2d 948, 955 (Pa. Super. 1997)(internal citations omitted)

Absent evidence of impairment because of medication or injury, a waiver is not rendered ineffective merely because an accused is hospitalized at the time of waiver. In *Ellis*, the Superior Court considered whether the evidence supported the trial court's conclusion that the defendant waived his rights where an officer administered Miranda warnings during Ellis' hospitalization. The court noted that although the defendant had undergone surgery and was on medication, he

10

presented no evidence that his cognitive functions were impaired, or that he was forced in any way to waive his rights. *Id.*, at 955.

Here, we considered evidence of Defendant's demeanor based upon the testimony of Officer Jenkins and Detective Rivera. Officer Jenkins testimony reflected that Defendant wished to speak about the incident, and appeared lucid and coherent. Detective Rivera thoroughly provided Defendant's Miranda warnings in English and Spanish, and affirmed Defendant's understanding. Defendant's demeanor evidenced that, although bandaged and salivating from removal of a tracheotomy

Defendant suffered no cognitive impairment. Defendant provided a calculated account of the killing, and transitioned easily from Spanish to English.

Further, Defendant presented neither lay nor expert testimony that his medical condition in any way affected his cognitive abilities.

Accordingly, we properly denied the motion to suppress.

## 2. THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION IN LIMITING THE PURPOSE FOR WHICH THE JURY COULD CONSIDER A HEARSAY STATEMENT REGARDING DEFENDANT'S ALLEGED INTOXICATION.

The trial court properly exercised its discretion in excluding an out-of-court statement as substantive evidence but allowing it for another proper purpose

The defense sought to offer the hearsay statement, included in the report of Deputy Coroner Zachary Sundin, that "according to the police, the decedent's boyfriend arrived home intoxicated and started waving a gun around". (N.T. pp. 108-109; pp. 391-403; pp. 420-425; pp. 432-433). The witness did not know which police officer allegedly made the statement, nor any information as to the source of the information. (N.T. pp. 432-433; pp. 436-437)

11

The defense sought to offer the statement as substantive evidence to support the claim that Defendant was in fact intoxicated at the time of the shooting. The court properly deemed the statement as hearsay. "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. When an extrajudicial statement is offered for a purpose apart from proving the proof of its contents, it is not hearsay and is not excluded under the hearsay rule." *See, Commonwealth v. Cassidy*, 315 Pa. Super. 429, 434, 462 A.2d 270, 273 (1983); *Commonwealth v. Collins*, 440 Pa. Super. 13, 654 A.2d 1174 (1995).

However, the court allowed introduction for a purpose other than substantive evidence, that is, in support of argument as to the completeness of the police report. (N.T. p. 440)

Accordingly, the court committed no error in excluding the hearsay statement as substantive evidence, and allowing its introduction for another relevant purpose.

> i. THE TRIAL COURT PROPERLY DENIED DEFENDANT'S POST SENTENCE MOTION WHERE THE COMMONWEALTH PRESENTED AMPLE EVIDENCE OF DEFENDANT'S SPECIFIC INTENT TO KILL, EVEN IF UNDER THE INFLUENCE OF DRUGS OR ALCOHOL.

Sufficient evidence supports the jury's conclusion that Defendant possessed the capability to form intent to kill in spite of alleged consumption of drugs or alcohol. Facts and resolution of disputed expert testimony considered by the jury well support the verdict as to each element of first degree murder.[4]

In order to support a charge of murder in the first degree, the Commonwealth must prove that "the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with deliberation." *Commonwealth v. Smith*, 580 Pa. 392, 861 A.2d 892, 895 (Pa. 2004). "Specific intent can be

---

[4] The defense raises no issue as to the jury's finding that Defendant shot and killed Nicole Berrios Serrano, but disputes only Defendant's ability to form the specific intent to kill, based upon his alleged level of intoxication.

12

inferred where a deadly weapon is used upon a vital part of the body." *Id.* (*See,* 18 Pa.C.S.A. § 2501 (a) (b) and 18 Pa.C.S.A. § 2502 (a)) The Commonwealth may prove the specific intent to kill with circumstantial evidence. *Commonwealth v. Fletcher,* 861 A.2d 898, 907 (2004) *citing Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 963 (2001) Further, the finding of specific intent to kill does not require planning, previous thought, or the passage of a particular length of time. Rather, all that is necessary is a fully formed conscious intent to kill. *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293 (1996)

"The well-known test of the sufficiency of the evidence is whether the evidence, and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain the conviction of murder in the first degree." *Commonwealth v. Fairell,* 476 Pa. 128, 381 A.2d 1258, 1262 (1977) (internal citations omitted). In order for a showing of voluntary intoxication to negate the intent necessary for a conviction of first-degree murder and reduce the crime of murder from first to third degree, the evidence must show that the defendant was unable to form the specific intent to kill because he was "so overwhelmed or overpowered by drugs to the point of losing his faculties at the time the crime was committed." *Commonwealth v. Fletcher,* 861 A.2d 898, 908 (2004). Pursuant to 18 Pa.C.S.A. § 308:

> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such condition be introduced to negative the element of intent of the offense; except that the evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

Although evidence of intoxication may, if believed, operate to negate the intent necessary for conviction of murder in the first degree, the claim creates no additional burden of proof for the Commonwealth. *Commonwealth v. Fairell,* 476 Pa. 128, 381 A.2d 1258 (1977)

13

Further, the Commonwealth need not produce expert testimony to counter a defendant's intoxication defense, and may offer any relevant evidentiary response to defense evidence, including lay testimony and testimony of surrounding circumstances. *Commonwealth v. Fairell*, *id.*, at 1262. The question of whether a defendant could not form the specific intent to kill is a question of fact solely within the province of the jury, who is free to believe any, all, or none of the testimony regarding intoxication. *Id.*, citing *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714, 720 (1984), cert. denied, *469 U.S. 963, 105 S.Ct. 36, 83 L.Ed.2d 297 (1984)*. For example, the jury may properly consider evidence of observation of a defendant's conduct, statements made to police, use of a weapon multiple times, and operation of a vehicle. See, *Commonwealth v. Miller*, 897 A.2d 1281 (2006); *Commonwealth v. Edmiston*, 634 A.2d 1078 (1993); and *Commonwealth v. Tucker*, 406 A.2d 785 (1975) The jury may find a defendant capable of forming specific intent even where he says "his mind went blank", he had a "vague recollection of pulling the trigger" and, afterwards "was trying to figure out what happened" and remember events immediately surrounding the killing. *Commonwealth v. Stoyko*, 475 A.2d 714 (1984)

In the instant case, the jury considered expert and lay evidence to determine whether Defendant could form intent to kill. As presented through the testimony of Nane Berdecia and Lithz Serrano, the evidence demonstrated that Defendant arrived at the apartment, spoke to Nicole, telling her that he loved her and did not want to lose her. (N.T. p. 230) Defendant went to the kitchen, reached up to the top of the counter and inserted the clip in the gun. (N.T. p. 232) Defendant left the apartment, and began shooting outside. He came back into the apartment, told Nicole to "look up", then shot her (N.T. p. 223) He then waited for Lithz Serrano outside the bathroom door, shot her twice, then ran. (N.T. p. 233)

14

Ms. Serrano testified that Defendant was lucid, and spoke to her normally as he pleaded with her to convince Nicole to reconcile with him. Defendant shot Ms. Serrano three times, left the apartment, returned, and said "Oh you're alive". (N.T. p. 262) Defendant then shot himself, changed his clothes, spit on the floor and left the apartment. *Id.* He drove himself to Harrisburg Hospital

The jury was free to reject the defense expert testimony. The defense toxicologist testified equivocally as to the physiological effect of substances Defendant ingested, and relied upon disputed factual testimony as to Defendant's demeanor.

All of this evidence, Defendant's statement and actions, taken together, sufficiently supports the jury's conclusion that Defendant was capable of forming the intent to act upon his anger, frustration and jealousy, by retrieving a gun, directing Nicole to look at him, then killing her.

Based upon their factual determinations, the jury rejected the defense argument and concluded that Defendant exhibited the capability to form intent.

4. THE WEIGHT OF EVIDENCE WELL SUPPORTS THE JURY'S CONCLUSION THAT DEFENDANT POSSSESSED THE ABILITY TO FORM THE INTENT TO KILL.

In addressing the standard of review of a denial of a post-trial motion, our appellate court has explained the distinction between claims as to weight of evidence and sufficiency of evidence:

> A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge, and his decision will not be reversed on appeal unless there has been an abuse of discretion. The test is not whether the court would have decided the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail.

15

*Commonwealth v. Whiteman*, 336 Pa. Super 120, 124-25, 485 A.2d 459, 461-62 (1984), citing, *Commonwealth v. Taylor*, 324 Pa. Super. 420, 425, 471 A.2d 1228, 1229-30 (1984); *Commonwealth v. Sample*, 321 Pa. Super. 457, 468 A.2d 799 (1983)(allocatur denied); *Commonwealth v. Miller*, 303 Pa. Super. 504, 450 A.2d 40 (1982) and *Commonwealth v. Vogel*, 501 Pa. 314, 461 A.2d 604 (1983) cert. denied, ____ U.S. ___, 104 S.Ct. 1603, 80 L.Ed. 2d 133 (1984).

We properly denied the motion for new trial as the weight of evidence well supported the verdict. The appellate court will reverse the lower court's verdict only if it is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Whitney, 511 Pa. 232, 239, 512 A.2d 1152, 1155( 1986) The factual issues as to the ability of the Defendant to form the intent to kill were solely within the province of the jury. "The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Jackson*, 506 PA. 469, 475, 485 A.2d 1102, 1104 (1984)

As set forth in detail, the jury heard and decided ample evidence that proved that Defendant acted with the specific intent to kill.

## CONCLUSION

For all of the foregoing reasons, the judgment of sentence should be affirmed.

BY THE COURT:

TODD A. HOOVER
PRESIDENT JUDGE

November ____, 2013

16